# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

### NO. 03-04-00489-CV

**MedCost, L.L.C., Appellant**

**v.**

**Robert Loiseau, Special Deputy Receiver of American Benefit Plans, et. al., Appellee**

### FROM THE DISTRICT COURT OF TRAVIS COUNTY, 53RD JUDICIAL DISTRICT
### NO. GN304388, HONORABLE LORA J. LIVINGSTON, JUDGE PRESIDING

## O P I N I O N

Appellant MedCost, a preferred provider organization ("PPO"), filed a special appearance in this action concerning the receivership of certain health insurance companies after the receiver, appellee Robert Loiseau,[1] joined MedCost as a defendant to collect for claims made against

---

[1] Appellee is the Special Deputy Receiver for the following entities: American Benefit Plans; National Association of Working Americans a/k/a National Association for Working Americans; United Employers Voluntary Employees Beneficiary Association; United Employers Voluntary Employees Beneficiary Association I; Electronic Benefits Group, Inc.; Enhanced Health Management, Inc.; Four Corners Company, LLC a/k/a Four Corners Co. LLC, a/k/a Four Corners Corp.; American Association of Agriculture, Forestry and Fishing Workers; American Association of Transportation, Communication, Electrical, Gas and Sanitary Workers; American Association of Wholesale Trade Workers; American Association of Manufacturer Workers; American Association of Service Workers; American Association of Construction Workers; and American Association of Professional Workers.

the entities in receivership ("the Neal entities").[2]  The district court denied MedCost's special appearance, and this interlocutory appeal followed.  Because we hold that the district court cannot properly exercise personal jurisdiction over MedCost, we will reverse the judgment.

## BACKGROUND

MedCost is a Delaware corporation with its principal place of business in North Carolina.  As a PPO, it organizes and maintains a network made up of lists of health care providers practicing only in North and South Carolina who agree to provide services at pre-negotiated rates to clients of the PPO.  MedCost sells its PPO lists to larger PPO organizations, which provide the lists to employers and health insurers.  MedCost does not handle claims for health care recipients or providers and does not provide health insurance.

MedCost contracted with American Healthcare Alliance ("AHA"), a national PPO based in Missouri, giving AHA access to MedCost's North and South Carolina networks.  AHA independently contracted with Progressive Administrators Resources ("PAR"), a third-party administrator in California, giving PAR access to the AHA network, which, through AHA's contract with MedCost, included MedCost's network.  UltraMed, an Oklahoma entity, contracted with PAR for third-party administrator services and claims processing and American Benefits Plan (ABP), one of the Neal entities based in Texas, to pay the networks and route claims.

---

[2]  Robert David Neal, a Texas resident, operated several fraudulent insurance companies based in Texas, including American Benefit Plans, United Employers Voluntary Employee Beneficiary Association, and National Association of Working Americans, all of which are now in receivership in Texas.

ABP provided the UltraMed Choice Health Plan to its insureds, including residents of the Carolinas. The card issued by the UltraMed Choice Health Plan indicated that the insurance was sponsored by the National Association of Working Americans ("NAWA") and referenced the United Employers Voluntary Employers Beneficiary Association ("UEVEBA") and PAR. ABP, NAWA, and UEVEBA are all Texas entities with their principal places of business in the Dallas-Fort Worth area.

MedCost did not enter into contracts with UltraMed, ABP, NAWA, UEVEBA, or Neal, but it did approve the UltraMed insurance identification card for use in its network in the Carolinas. It received $3 monthly from AHA for each of the 379 individual insureds in the Carolinas who enjoyed access to the MedCost network through the NAWA UltraMed plan. They and the health care providers suffered losses when the NAWA UltraMed coverage turned out to be worthless. The Texas companies were ultimately placed into receivership, and MedCost terminated access to its network,[3] issuing an internal email reporting that the coverage should have raised a "red flag" from the beginning because UltraMed was a coalition of employees.[4]

Robert Loiseau is the receiver for ABP, NAWA, and UEVEBA, as well as other companies. The receivership court found that these companies engaged in improper insurance practices by creating, marketing, and selling unauthorized health insurance plans, collecting money,

---

[3] The record reflects that MedCost terminated network access after MedCost had become aware of UltraMed's connection to the Neal entities and of Neal's having encountered legal problems in Texas concerning his health insurance businesses and after UltraMed had failed for the second time to pay fees for a period of several months.

[4] MedCost's policy is to disfavor coverage provided by coalitions of employees because it believes such arrangements are not legal in some states.

and failing to pay claims. When the Texas companies went into receivership, the Receiver was charged with paying claims of insureds and providers, including those within MedCost's network. North and South Carolina insureds with claims against ABP and related companies in receivership have assigned their claims to the Receiver. Various departments of insurance in states where ABP and related entities offered insurance decided it would be easier and cheaper to handle all these claims in one state, Texas, because the largest number of ABP insureds and claims come from this state and because the Neal entities were based here. None of the claims of Texan insureds or claims originating in Texas involved MedCost's networks. The Receiver has filed suit against MedCost seeking damages under section 101.201 of the Texas Insurance Code for assisting in the procurement of the illegal insurance contracts.[5]

MedCost filed a special appearance, which the district court denied after a hearing. MedCost appeals that denial, claiming that it does not have minimum contacts with Texas sufficient to confer personal jurisdiction upon Texas. The Receiver counters that, because MedCost's contracts facilitated the Texas-based entities' providing illegal health insurance to users of MedCost's network in the Carolinas, the trial court properly held that MedCost is subject to personal jurisdiction in Texas, where all the receivership entities are based.

---

[5] Section 101.201(a) reads:

". . . A person who in any manner assisted directly or indirectly in the procurement of the contract is liable to the insured for the full amount of a claim or loss under the terms of the contract if the unauthorized insurer fails to pay the claim or loss."

Tex. Ins. Code § 101.201(a) (West Supp. 2004-05).

4

## DISCUSSION

### Standard of Review

Whether a court has personal jurisdiction over a defendant is a question of law, which we review *de novo*. *American Type Culture Collection, Inc. v. Coleman*, 83 S.W.3d 801, 805-06 (Tex. 2002); *BMC Software Belg., N.V. v. Marchand*, 83 S.W.3d 789, 794 (Tex. 2002). However, where the trial court issues findings of fact and conclusions of law in denying a special appearance, the conclusions of law are reviewed *de novo* and challenged fact findings are reviewed under no-evidence and insufficient evidence standards for legal and factual sufficiency. *Marchand*, 83 S.W.3d at 794; *Botter v. American Dental Ass'n*, 124 S.W.3d 856, 861 (Tex. App.—Austin 2003, no pet.). In this case, MedCost argues that the court's findings of fact and conclusions of law are factually and legally insufficient to confer jurisdiction.[6] We assume for purposes of this analysis that the court's findings of fact are supported by sufficient evidence, but because we hold that the court's conclusions of law are erroneous, we must reverse and need not decide the sufficiency of the evidence supporting the fact findings.

### Jurisdiction

Texas courts may exercise jurisdiction over nonresident defendants if the Texas long-arm statute authorizes the exercise of jurisdiction and that exercise is consistent with federal and state standards of due process. *Guardian Royal Exch. Assurance, Ltd. v. English China Clays, P.L.C.* , 815 S.W.2d 223, 226 (Tex. 1991); *Botter*, 124 S.W.3d at 861. The Texas long-arm statute

---

[6] Specifically, MedCost challenges Findings of Fact 8-29 and Conclusions of Law 1-4.

5

permits courts to exercise personal jurisdiction over a nonresident defendant when such power is permitted by the federal constitutional requirements of due process. Tex. Civ. Prac. & Rem. Code Ann. §§ 17.041-.045 (West 1997); *Marchand*, 83 S.W.3d at 795; *Pessina v. Rosson*, 77 S.W.3d 293, 297 (Tex. App.—Austin 2001, pet. denied) (broad language of statute permits expansive reach limited only by federal requirements of due process). Federal standards of due process require that (1) the defendant has purposefully established minimum contacts with Texas, and (2) the exercise of jurisdiction comports with traditional notions of fair play and substantial justice. *Burger King Corp. v. Rudzewics*, 471 U.S. 462, 475-76 (1985)*; Marchand*, 83 S.W.3d at 795 (citing *International Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)); *CSR, Ltd. v. Link*, 925 S.W.2d 591, 594 (Tex. 1996). If the defendant has not purposefully established minimum contacts with the forum state, the exercise of jurisdiction cannot comport with traditional notions of fair play and substantial justice. *International Shoe*, 326 U.S. at 316.

The plaintiff bears the initial burden of pleading sufficient allegations to bring a nonresident defendant within the provisions of the long-arm statute. *Marchand*, 83 S.W.3d at 793. Upon filing a special appearance, a nonresident challenging personal jurisdiction assumes the burden of negating all jurisdictional bases. Tex. R. Civ. P. 120a; *Coleman*, 83 S.W.3d at 807 (citing *Kawasaki Steel Corp. v. Middleton*, 699 S.W.2d 199, 203 (Tex. 1985)). If the plaintiff has failed to sufficiently allege personal jurisdiction, the defendant can defeat personal jurisdiction by presenting evidence that it is a nonresident. *Siskind v. Villa Found. for Educ., Inc.*, 642 S.W.2d 434, 438 (Tex. 1982).

Under the due process analysis, we must apply the "ultimate test" of minimum contacts: whether the nonresident defendant has purposefully availed itself of the privilege of conducting activities within the forum state, thus invoking the benefits and protections of its laws. *Burger King*, 471 U.S. at 475; *Botter*, 124 S.W.3d at 862. The "purposeful availment" requirement ensures that a defendant will not be called into court in a jurisdiction based only upon random, fortuitous, or attenuated contacts, or the unilateral activity of another party or a third person. *Burger King*, 471 U.S. at 475; *Guardian Royal*, 815 S.W.2d at 226. Rather, the activities in the state must have been intentional. *Schlobohm v. Schapiro,* 784 S.W.2d 355, 357 (Tex. 1990). The activities conducted in the forum state must justify a conclusion that the defendant should reasonably anticipate being haled into court in that state. *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980). The minimum contacts analysis protects a foreign corporation from suit in a Texas court if its relationship with Texas is so remote or attenuated that it could not reasonably anticipate having to defend itself in a Texas court. *Id.* Foreseeability is an important consideration in deciding whether a nonresident defendant has purposefully established minimum contacts with a forum state. *Id.*; *Marchand*, 83 S.W.3d at 795; *Guardian Royal*, 815 S.W.2d at 227.

The jurisdiction of Texas courts is always dependent on the defendant's having some minimum contacts with Texas, but the requisite extent of those contacts varies depending whether the type of *in personam* jurisdiction in question is specific or general. *Guardian Royal*, 815 S.W.2d at 227; *Botter,* 124 S.W.3d at 862. The exercise of personal jurisdiction is proper if the nonresident defendant's minimum contacts give rise to either specific or general jurisdiction. *Marchand*, 83

7

S.W.3d at 795 (citing *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 413-14 (1984)); *Guardian Royal*, 815 S.W.2d at 226.

### *Specific Jurisdiction*

A court may exercise specific jurisdiction over a nonresident defendant when the defendant's purposeful contacts with the forum give rise to or are related to the cause of action. *Coleman*, 83 S.W.3d at 806; *Guardian Royal*, 815 S.W.2d at 228. In analyzing minimum contacts for purposes of Texas courts' specific jurisdiction, we focus on the relationship among the nonresident defendant, the forum, and the litigation. *Botter*, 124 S.W.3d at 862 (citing *Guardian Royal*, 815 S.W.2d at 227).

The Texas Supreme Court has developed a formula to determine whether specific jurisdiction exists sufficient to satisfy the federal constitutional standard: (1) the nonresident defendant or foreign corporation must purposefully take some action or consummate some transaction in the forum state; (2) the cause of action must arise from or be connected with such act or transaction; and (3) the assumption of jurisdiction by the forum state must not offend traditional notions of fair play and substantial justice, considering the quality, nature, and extent of the activity in the forum state, the relative convenience of the parties, the benefits and protection of the laws of the forum state afforded the respective parties, and the basic equities of the situation. *Botter,* 124 S.W.3d at 862 (citing *Schlobohm*, 784 S.W.2d at 358). Thus, before a Texas court can assume specific jurisdiction over MedCost, it must find that MedCost purposefully performed some act in Texas and that the controversy arose out of that act. *Helicopteros Nacionales*, 466 U.S. at 415.

8

MedCost argues that personal jurisdiction is improper because its contacts with Texas occurred only through the contract of a third party and are at best remote and attenuated because of the nature of the chain of contractual relationships—MedCost contracted with AHA for access to its network, but AHA was the entity that provided the network to Texas-based insurers through AHA's contracts with Oklahoma-based UltraMed to which MedCost was not a party. *See Burger King*, 471 U.S. at 475; *Hitachi Shin Din Cable, Ltd. v. Cain*, 106 S.W.3d 776, 784 (Tex. App.—Texarkana 2003, no pet.) (Chinese manufacturer's contract to ship goods at French company's direction did not constitute purposeful availment of privileges of doing business in Texas when Chinese company complied with French company's directive to ship goods to Texas).

The Receiver, however, points out contacts other than the contractual relationship.[7] He argues that there are sufficient contacts for Texas to assume specific jurisdiction over MedCost because MedCost's approval of the identification cards listing the Texas companies constituted an intentional act that gave rise to this cause of action and because the impact of MedCost's act is felt in Texas. MedCost responds that because it does not have minimum contacts with Texas, the trial

---

[7] Although the parties agree that MedCost did not contract directly with any of the Texas insurance carriers at the time this cause of action arose, the Receiver argues that MedCost's business dealings with the receivership entities constituted a *de facto* contractual relationship. We note that simply contracting with a Texas resident alone is not enough to establish minimum contacts with this state. *Burger King Corp. v. Rudzewics*, 471 U.S. 462, 478 (1985); *Blair Communications, Inc. v. SES Survey Equip. Servs, Inc.,* 80 S.W.3d 723, 730 (Tex. App.—Houston [1st Dist.] 2002, no pet.) ("We do not believe that initiating contract discussions with a Texas resident, and subsequently entering into a contract, in addition to making payment in Texas, are sufficient contacts with Texas when the entire substance of the contract is performed outside the state."). Thus, contrary to the dissent's suggestion, MedCost's "profit-based relationship" through an attenuated chain of contracts with others cannot confer personal jurisdiction, nor can the fact that MedCost ultimately received moneys from Texas entities through UltraMed, PAR, and AHA.

9

court should have granted its special appearance. We will examine each of MedCost's alleged extra-contractual contacts with Texas in turn.

*Identification Cards*

The Receiver argues that MedCost is liable for the losses resulting from NAWA's and UEVEBA's failure to pay claims because MedCost allowed both to provide unauthorized health care coverage to insureds using its network. He argues that MedCost acted affirmatively to allow access by approving the insurance identification card that brought its network together with the unauthorized coverage, and because that coverage came from Texas, the Receiver argues, MedCost could expect to be sued here. The identification card that MedCost approved lists the names or includes the logos of UltraMed, NAWA, AHA, PAR, and MedCost. Upon receipt of a sample card, MedCost evaluated it according to its "Payor Repricing ID Card Check List" and its "New Client Check List," and approved it for use by insureds accessing MedCost's network of health care providers in North and South Carolina. The Receiver argues that this checklist and procedure show that MedCost served a gatekeeping function and that MedCost is liable for its failure to properly screen the companies using its network.[8]

In order to show that the approval of the card constituted sufficient minimum contacts for specific jurisdiction, the Receiver must show that, by approving this card, MedCost performed

---

[8] MedCost argues that it approved the form of the card, not a plan or coverage, merely ensuring that information reflected on the card was accurate. It characterizes the process as administrative in nature and designed to ensure that the necessary information was recorded and relayed to providers in the Carolinas. Whether MedCost had a duty to further investigate is relevant to the merits of its liability, but not to the question of whether it took an intentional act in this state.

an action in Texas and that the approval gave rise to this cause of action. *See Schlobohm*, 784 S.W.2d at 358. While MedCost might be liable for its failure to gatekeep, the relevant inquiry here is whether its approval of the identification card was an act taken in Texas, not whether MedCost should have allowed the Neal entities access to its network. The merits of the Receiver's case against MedCost are not now before us. *Morris v. Kohls-York*, No. 03-04-00371-CV, 2005 Tex. App. LEXIS 3404, at *13 (Austin May 5, 2005, no pet. h.).

The Receiver does not argue that MedCost's approval of the cards took place in Texas rather than in North Carolina, where MedCost's operations are located. Instead, he argues that it is sufficient that MedCost knew that the entities it was approving were Texas-based.[9]

We are willing to grant that it may have been foreseeable to MedCost that the Neal entities would misuse its network, but the foreseeability we are concerned with for purposes of our due-process analysis is whether MedCost could reasonably have expected to be haled into court in Texas for the Texas companies' misuse of that network in the Carolinas. *World-Wide Volkswagen*, 444 U.S. at 297; *Guardian Royal*, 815 S.W.2d at 227. MedCost's network dealt only with claims originating in the Carolinas and included health care providers only in the Carolinas. In fact, the causes of action that the Receiver is now asserting belong to residents of the Carolinas and arose in

---

[9] We note that UltraMed was based in Oklahoma, and that, under the Receiver's argument, even though the other Neal entities were based in Texas and the injury was to insureds in the Carolinas, because MedCost affirmatively approved an identification card listing an Oklahoma company which eventually failed to pay claims in the Carolinas, MedCost could reasonably expect to be haled into court in Oklahoma as well. It may be suggested that MedCost's relationship to Texas was more substantial because it approved more Texas companies' use of its network, but the nature and quality of the relationships were the same. *See American Type Culture Collection v. Coleman*, 83 S.W.3d 801, 810 (Tex. 2002) ("Rather than the quantity of contacts with Texas as compared to other jurisdictions, we look to the nature and quality of those contacts.").

the Carolinas when the Neal entities failed to pay claims in the Carolinas. For failing to adequately protect its customers in the Carolinas from injury from other entities, it is foreseeable that MedCost would be called into court in those states. However, it was not foreseeable that MedCost would be called into court in Texas for failing to do its job in the Carolinas by members or users of its network in the Carolinas who were injured by entities that happened to be based in Texas, because MedCost did not purposefully avail itself of the privilege of doing business in Texas. Purposeful availment may not be based upon such random or fortuitous contacts with a state. *Burger King*, 471 U.S. at 475; *Guardian Royal*, 815 S.W.2d at 226.

The Receiver argues that, under the insurance code, MedCost's actions constituted procurement. *See* Tex. Ins. Code Ann. § 101.201(a) (holding persons liable who in any manner assisted directly or indirectly in the procurement of fraudulent insurance contract). Through its own action, the Receiver argues, MedCost "allowed" the unauthorized coverage, which came from Texas entities. We find this argument aimed again at the merits of MedCost's liability. The question before us now is not whether this is procurement; the question is whether the alleged procurement happened in Texas. The Receiver does not adequately plead that MedCost acted in Texas by approving the identification card for use in the Carolinas.

It is suggested that Texas is the locus of a nationwide fraudulent insurance scheme and that therefore all the claims that relate to that scheme are properly brought here. MedCost, however, is not being sued because it conducted certain activity that was "nationwide," but for assisting in the procurement of insurance contracts under which unauthorized insurers failed to pay claims. *See id*. Therefore, any liability of MedCost here would be for failure to protect the North

12

and South Carolina insureds and providers in its network from the illegal contracts it allegedly assisted in procuring. The fact that the same fraudulent insurers may have also injured insureds or providers in other states, including their home state, has no bearing on MedCost's liability on the claims that the Receiver asserts here. Nor did the nationwide scope of the Neal entities' scam have anything to do with the character of the causes of action. That is, we cannot examine the behavior of other entities whom MedCost allowed into the Carolinas, geographically locate the greatest concentration of all of those entities' misdeeds, and then bring MedCost into court wherever that may be; it is MedCost's actions that matter, and those actions both occurred in the Carolinas and jeopardized only residents and consumers in the Carolinas. Other unilateral actions by the Neal entities, such as their choice to headquarter themselves in Texas and not, for instance, Nevada, cannot justify our exercise of personal jurisdiction over MedCost. *See Burger King*, 471 U.S. at 475; *Guardian Royal*, 815 S.W.2d at 226 (defendants may not be called into court based solely upon unilateral activity of another party or third person).

We find a recent case from this Court instructive on the question of when a nonresident entity's endorsement or gatekeeping activities can subject it to jurisdiction in Texas. In *Botter*, the plaintiffs sued the American Dental Association ("ADA") for "marketing" a dangerous amalgam through its seal of approval in much the same way that MedCost here is accused of assisting in the procurement of an insurance program by approving its identification card for use in the MedCost network. 124 S.W.3d at 863. The Botters alleged that the ADA's endorsement and pamphlet advertising amalgam, its licensing of thousands of Texas dentist members who may not practice without such license, and its active governance of those members by an ethical code that

13

would prevent them from warning about the amalgam constituted "*purposeful actions* in Texas that *caused this litigation*." *Id.* We held that specific jurisdiction did not exist because the Botters had not "sufficiently alleged that the ADA's extra-territorial conduct was focused on the plaintiff in Texas," and there were no purposeful contacts in Texas by the ADA. *Id*. at 864. Surely here, where the original plaintiffs were actually located in the Carolinas, and where the complaint is that MedCost allowed fraudulent insurers into the Carolinas, MedCost's actions are even more difficult to cast as having been focused on a plaintiff in Texas or as establishing purposeful contacts with Texas.[10] The dissent attempts to distinguish *Botter*, claiming that MedCost had a more substantial connection to Texas than did the ADA. Given that the ADA actively governed thousands of licensed dentists and pamphleted in favor of amalgam here, while MedCost, without contracts with Texas entities, allowed them to distribute identification cards bearing a MedCost logo to their clientele, we disagree.

We conclude that the Receiver has not sufficiently alleged that MedCost, through its approval of the ID card to be used in the Carolinas, acted purposefully in Texas. Even if it is true that, by affirmatively approving the identification card for use by the Neal entities in the Carolinas, MedCost assisted in the procurement of the coverage, the Receiver has failed to sufficiently allege that that procurement occurred in Texas.

---

[10] We recognize that in *Botter*, the ADA was basically charged with having allowed dangerous amalgams into Texas, *see generally Botter v. American Dental Ass'n*, 124 S.W.3d 856 (Tex. App.—Austin 2003, no pet.), while here, MedCost is alleged to have allowed dangerous Texas residents into the Carolinas. We believe that this fact argues even more strongly against asserting personal jurisdiction over MedCost in Texas merely because the danger to the North and South Carolina health care recipients and providers originated here.

14

*Injury in Texas*

The Receiver next argues that, even if MedCost had no direct contact with Texas, its conduct may subject it to personal jurisdiction because it committed a tort knowing that the resulting injury would be felt in Texas. The only harm that the Receiver claims is felt in Texas from MedCost's conduct is that the Texas Receiver must satisfy the unpaid claims from MedCost's network and that MedCost affirmatively caused those costs when it approved the Neal entities' access to its network.[11]

The Receiver is suing on behalf of North and South Carolina insureds who were harmed by the Neal entities' failure to pay their claims in the Carolinas for health care provided in the Carolinas through MedCost's network. He now argues that, in pursuing their claims, he is suffering harm in Texas because he will have to pay the claims here. That is, because he chooses to litigate in Texas on behalf of the Carolina individuals, Texas will make him pay the claims on behalf of the Neal entities here. Had he chosen to litigate these claims in the Carolinas, he would be obligated to pay the claims there. Thus, despite his argument that MedCost took action for which it should be held liable, the connection to the forum state, if that connection is the harm to the Texas receiver of having to pay the claims here, occurs solely at the Receiver's discretion and is the result

---

[11] This is an odd concept of harm; the Receiver has to pay the Carolina claims because he stands in the shoes of the receivership entities and because he chose to litigate the claims in Texas. Thus, his argument is that, because MedCost allowed the Neal entities into the Carolinas and the receiver of the Neal entities must now at least partially make good on the insurance that they promised, MedCost has caused damage in Texas. Or, more succinctly: because MedCost did not stop the Neal entities from harming others, it is MedCost's fault that the Receiver standing in the shoes of the Neal entities must now pay for that harm.

of his unilateral act. The unilateral acts of plaintiffs or third parties will not give Texas courts jurisdictions over nonresidents. *Burger King*, 471 U.S. at 475; *Guardian Royal*, 815 S.W.2d at 226.

Furthermore, the cases the Receiver cites do not apply in this context. *See Calder v. Jones*, 465 U.S. 783, 789 (1984); *Memorial Hosp. Sys. v. Fisher Ins. Agency*, 835 S.W.2d 645, 648 (Tex. App.—Houston [14th Dist.] 1992, no writ); *General Elec. Co. v. Brown & Ross Int'l Distribs, Inc.*, 804 S.W.2d 527, 533 (Tex. App.—Houston [1st Dist.] 1990, writ. denied).

In *Calder*, employees of the National Enquirer libeled a California resident by printing a story about her from their base in Florida. 486 U.S. at 789. The United States Supreme Court ruled that the defendants had substantial contacts in California because they knew that the injury would occur in California, where their greatest magazine circulation was and where the plaintiff lived and worked. *Id.* at 789-90. This case is unlike *Calder*, because MedCost did not commit a tort knowing that the resulting injury would be felt in Texas; and, in fact, the Receiver barely alleges that any injury was felt here. In *Calder*, the activities were purposefully directed *to* the forum state, California; here the harmful activities were directed *from* the forum state, Texas to the Carolinas. *See Calder*, 486 U.S. at 790. None of the plaintiffs upon whose behalf the Receiver is suing MedCost are from Texas and none of the injuries for which he is suing occurred here.[12] Because the foreseeable victims in this case are the plaintiffs using the Carolina networks, none of whom resides in Texas, under *Calder*, specific jurisdiction is not proper here. *See National Indus.*

---

[12] *See also Guardian Royal Exch. Assurance. Ltd. v. English China Clays, P.L.C.*, 815 S.W.3d 223, 233 (Tex. l991) (where parties are "neither Texas consumers nor insureds, Texas'[s] interest in adjudicating the dispute (including its special interest in regulating insurance) is considerably diminished").

16

*Sand Ass'n v. Hon. Jay Gibson, Judge*, 897 S.W.2d 769, 776 (Tex. 1995) (under *Calder*, "[j]urisdiction based upon the effects of extra-territorial conduct within a particular forum is proper only when the extra-territorial conduct focuses upon a plaintiff residing in that forum").

In *Memorial Hospital System*, the plaintiff, a Texas hospital, phoned the nonresident defendant insurance company to inquire about insurance coverage for a patient. 835 S.W.2d at 648. The court held that the defendant's misrepresentation of coverage to the plaintiff constituted a tort committed with a foreseeable economic injury in Texas. *Id*. at 651. Here, the closest analogy the Receiver can make is that MedCost's approval of the identification card misled consumers, who were foreseeably harmed by relying on health insurance for use in the MedCost network that ultimately proved to be worthless. Unlike the injured hospital in *Memorial Hospital*, neither the insureds nor the health care providers in this case resided in Texas, and their economic injury was not felt here. The fact that they assigned their claims to a Texas resident does not transform their injury in the Carolinas to a harm suffered in Texas.

In *General Electric*, the court held that although the nonresident defendants involved in a conspiracy to sell counterfeit General Electric parts had little physical contact with Texas, they should have known that their conduct would have an impact upon Texas and therefore the exercise of personal jurisdiction over them was proper. 804 S.W.2d at 533. The Receiver compares MedCost's contacts to those of the two individual defendants in *General Electric*, who knew their conduct would have effects in Texas because they intentionally pursued consumers here. *See id.* at 532-33 (defendants made individual visits to Texas, called customers and employees by telephone here, solicited and cultivated business relationships here, and sold counterfeit parts to Texas

17

consumers, diverting General Electric customers to their own company). These *General Electric* defendants contracted with Texas companies and sold counterfeit parts directly to them. *Id*. Therefore, it was foreseeable that General Electric might sue in Texas, where the tortious acts had taken place and where it had been injured. *Id*. at 533. In contrast, MedCost did not contract with or injure any Texas residents.[13] Unlike the *General Electric* defendants, MedCost did not come to Texas at all; rather, it allowed Texans—the Neal entities—to come to the Carolinas. The foreseeability analysis is therefore entirely distinct from that in *General Electric*. Where the acts giving rise to the suit did not arise in Texas and the defendant did not invoke the protections and benefits of Texas laws, "the fact that a tort is alleged to have been committed by a person out-of-state and that the tort may have had an effect in Texas is not sufficient for a court to exercise personal jurisdiction." *Morris*, 2005 Tex. App. LEXIS 3404, at *14.

We hold that the Receiver has not sufficiently alleged that MedCost committed a tort knowing that the harm would be felt in Texas, or even that any harm related to this cause of action has occurred in Texas. Therefore MedCost defeated specific jurisdiction by presenting evidence that it was a nonresident in the hearing below. *See Siskind*, 642 S.W.2d at 438.

---

[13] The district court's findings of fact do not include a finding that MedCost contracted directly with any Texas entity at the time of the events giving rise to this suit, nor do they list any Texas residents who were injured by MedCost. In characterizing MedCost's involvement as participation in a unitary fraudulent scheme headed by the Neal entities, the dissent imputes to MedCost all injuries that the Neal entities caused in Texas or elsewhere. We do not believe it is appropriate to subject this Carolina resident to jurisdiction in a locale other than where it caused the injuries giving rise to the claims at issue. *See Guardian Royal*, 815 S.W.2d at 227 (for minimum contacts, we examine relationship between nonresident defendant, forum, and this litigation).

18

*General Jurisdiction*

An assertion of general jurisdiction compels a more demanding minimum-contacts analysis than an assertion of specific jurisdiction and requires a showing of substantial activities within the forum state. *Botter*, 124 S.W.3d at 862. General jurisdiction exists when the defendant's contacts with Texas "are continuous and systematic so that the forum may exercise personal jurisdiction over the defendant even if the cause of action did not arise from or relate to activities conducted within the forum state." *Marchand*, 83 S.W.3d at 796 (citing *Guardian Royal*, 815 S.W.2d at 228); *CSR, Ltd.*, 925 S.W.2d at 595. To negate the exercise of general jurisdiction, the nonresident defendant must show it does not conduct substantial activities within the forum. *Marchand*, 83 S.W.3d at 797.

The Receiver argues that Texas courts have general jurisdiction over MedCost because MedCost has actual continuing contractual relationships with various Texas entities and regularly does business with nine named insurance companies in Texas. In the trial court he presented printouts from MedCost's current website as evidence of these relationships. The site, however, reflects the state of affairs at the time of the hearing, not during the relevant time period, when the claims accrued. The relevant contacts are those up to the time of injury. *Botter*, 124 S.W.3d at 865.

Although it is true that a defendant bears the burden of negating the plaintiff's alleged bases of jurisdiction, the plaintiff must first show that what it alleges is actually a basis of jurisdiction. *Id.* (citing *Marchand*, 83 S.W.3d at 793). A subsequent website does not present the court with sufficient information to substantiate the allegations for proof of a pattern showing

continuous and systematic activity at the time of the alleged injury. *See Botter*, 124 S.W.3d at 865. In *Botter*, "the information on the [current] ADA website [was] not probative in our jurisdictional analysis because it is not the same information that was on the website when the Botters' action accrued." 124 S.W.3d at 865. Information from the MedCost website existing at the time of the trial court hearing, not at the time the causes of action accrued, cannot serve as the basis of our jurisdiction. We thus conclude that the receiver has failed to demonstrate that Texas courts may exercise general jurisdiction over MedCost in this suit.

## CONCLUSION

Because MedCost is not a resident of Texas and does not have minimum contacts with the state sufficient to support either specific or general jurisdiction in this case, we hold that the district court does not have personal jurisdiction over MedCost. We therefore reverse the judgment of the district court and render judgment dismissing the Receiver's claims.

_____

David Puryear, Justice

Before Chief Justice Law, Justices Patterson and Puryear: Opinion by Justice Puryear;
    Dissenting Opinion by Justice Patterson

Reversed and Rendered

Filed: May 26, 2005

20